# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KAREN BROOKS              *
                          *
        v.                *        Civil Action WMN-07-CV-3224
                          *
STATE OF MARYLAND, <u>et al.</u>   *

    *    *    *    *    *    *    *    *    *    *    *    *

## <u>MEMORANDUM</u>

The sole remaining claim in this case is one for
retaliatory discharge, brought pursuant to Title VII, against
the Board of Liquor License Commissioners for Baltimore City
(Liquor Board or BLLC) and the State of Maryland.  Plaintiff
Karen Brooks asserts that the Liquor Board discharged her from
her position as a liquor inspector in March 2006 in retaliation
for her having filed a complaint of sexual harassment against
her supervisor, Samuel T. Daniels, in June 2003.  Judge William
Quarles previously ruled on Defendants' motion for summary
judgment, but recused himself from the case shortly before
trial, and the case was reassigned to the undersigned.  During
their pretrial conference, Defendants requested to renew their
motion for summary judgment, and the Court granted that request.
Defendants' renewed motion raised only the issue of whether the
termination was retaliatory under Title VII.[1]  The motion is now

---

[1] Plaintiff also raised the issue of damages in her response,
although made no motion for Judge Quarles' prior decision on
that issue to be reconsidered.  The Court notes that the damages
issue has been raised in a motion in limine and the Court will,

ripe.  Upon review of the pleadings and the applicable case law,
the Court determines that no hearing is necessary, Local Rule
105.6, and Defendants' renewed motion will be denied.

## I.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the evidence before the
court, consisting of the pleadings, depositions, answers to
interrogatories, and admissions of record, establishes that
there is no genuine issue of material fact and that the moving
party is entitled to judgment as a matter of law.  Fed. R. Civ.
P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A
party seeking summary judgment bears the initial responsibility
of informing the court of the basis of its motion and
identifying the portions of the opposing party's case which it
believes demonstrate the absence of a genuine issue of material
fact.  Id. at 323.

If the movant demonstrates that there is no genuine issue
of material fact and that the movant is entitled to summary
judgment as a matter of law, the non-moving party must, in order
to withstand the motion for summary judgment, produce sufficient
evidence in the form of depositions, affidavits, or other
documentation which demonstrates that a triable issue of fact
exists for trial.  Celotex, 477 U.S. at 324.  Unsupported

therefore, address the parties' arguments on the issue when it
decides that motion.

speculation is insufficient to defeat a motion for summary judgment. <u>Felty</u>, 818 F.2d at 1128 (citing <u>Ash v. United Parcel Serv., Inc.</u>, 800 F.2d 409, 411-12 (4th Cir. 1986)). Furthermore, the mere existence of some factual dispute is insufficient to defeat a motion for summary judgment; there must be a genuine issue of material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). Thus, only disputes over those facts that might affect the outcome of the case under the governing law are considered to be "material." <u>Id.</u>

## II.  BACKGROUND

Because Plaintiff is the non-moving party, the facts are stated, with reasonable inferences drawn, in the light most favorable to Plaintiff. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (per curiam). Defendants hired Plaintiff as a Liquor Inspector I in 1999. Plaintiff performed well in this position and approximately one year later Defendants promoted her to Liquor Inspector II. For the first four years, Plaintiff worked closely with her supervisor, Chief Inspector Samuel T. Daniels, Jr. Plaintiff was even dubbed "the little chief" by her peers.

## A.   Plaintiff's Sexual Harassment Complaint and Removal from Chief Daniels' Supervision

Plaintiff alleges that while she was working with Chief Daniels, he would subject her to rude sexual comments and

innuendo.  In March 2003, Plaintiff made a verbal complaint of
sexual harassment against Chief Daniels to Executive Secretary,
Nathan Irby.  At Secretary Irby's request, Appellant filed a
written complaint in June 2003.  The EEO office investigated
Plaintiff's complaint, but did not find a violation of the
city's sexual harassment policy because the investigator could
not determine the credibility of Plaintiff's complaint and
because the city's sexual harassment policies only described
quid pro quo harassment and the resulting hostile environment,
but not the type of hostile environment alleged by Plaintiff.
The investigator made several recommendations, however,
including that Ms. Brooks be supervised by the Assistant Chief
or Secretary Irby rather than Chief Daniels.

Shortly after Plaintiff made her verbal complaint, Chief
Daniels wrote a letter to Secretary Irby expressing that he had
"no professional trust or dependence on Plaintiff's continued
function within the Inspection Division" primarily due to his
allegation that she failed to participate in an assignment.
Plaintiff responded to that letter on March 20, 2003, explaining
her side of the situation and concluding that "[f]or far too
long I have been subjected to Daniels rude, crass, and often
offensive comments while on the job."  Chief Daniels responded
on March 22, 2003, accusing Brooks of manufacturing a sexual
harassment allegation with a co-worker, Office Manager Worrell,

and concluded that "[g]iven Inspector Brooks current actions, I envision no future credible role for her in the Inspection Division."

As a result of this exchange, Executive Secretary Irby removed Plaintiff from Chief Daniels' supervision, reassigned her to daytime duties, and, with the support of the Assistant Chief Inspector, began to supervise her personally. The reassignment was formalized when the EEO recommended that Plaintiff and Chief Daniels remain separated. Plaintiff had no contact with Chief Daniels for the next two years and, according to Secretary Irby, her performance during this period was "exceptional."

## B.   New Liquor Board and Plaintiff's Return to Chief Daniels' Supervision

In August 2005, a new Board of Liquor License Commissioners was convened consisting of Chairman Mark Fosler, Jeffrey Pope, and Edward Smith. Plaintiff and Secretary Irby allege that Commissioner Smith and Chief Daniels were close friends and that the new Liquor Board empowered Chief Daniels with greater authority, often bypassing Secretary Irby in the decision-making process. Plaintiff also alleges that Smith exerted a dominating presence on the Liquor Board.

Shortly after the new Liquor Board convened, Plaintiff alleges that she was in the same office as Chief Daniels when he

bragged loudly to others about how the new Liquor Board had empowered him to make changes and that in about eight days the fun was going to begin. Plaintiff alleges that he declared, "[I]t's gonna be like Kool Moe Dee all day long; how ya like me now." Plaintiff believed that these comments were directed at her and were an indication of his intent to retaliate against her based on her understanding of the retaliatory nature of the lyrics of the Kool Moe Dee song referred to by Chief Daniels.

The new Liquor Board instituted two policy changes relating to the day-to-day work of the liquor inspectors. They required the inspectors to work 8 hour days and to document that they were doing so by signing in and out. They also reinstated the practice of conducting night time inspections, known as "Door Stop" operations, at Baltimore city bars and clubs.

In conjunction with the Door Stop operations, Chief Daniels sent a memorandum to four liquor inspectors, including Plaintiff, directing them to participate in a Door Stop operation on August 26, 2005. Plaintiff sent a response to Chief Daniels stating that she couldn't participate in the operation because she already had scheduled a pre-operative visit for her son at the hospital. Plaintiff also reminded Chief Daniels that she was exempt from working with him.

Shortly thereafter, on August 29, 2005, Commissioner Smith, held a meeting with Plaintiff and Mr. Irby. At that meeting,

Commissioner Smith directed that Plaintiff be reassigned to work under Chief Daniels' supervision. According to Plaintiff, Commissioner Smith told Plaintiff that he had reviewed Plaintiff's 2003 sexual harassment complaint and believed that it lacked merit. According to Plaintiff, he told her that he would have no problem terminating Plaintiff's employment and justifying his actions.

On September 9, 2005, the Commissioners issued another directive establishing two work-shifts for inspectors, effective September 12, 2005: a day shift from 8:30 a.m. to 4:30 p.m., and a night shift from 7:00 p.m. to 3:00 a.m. Defendants assigned Plaintiff to the day shift and she claims that she made several child care scheduling adjustments to accommodate the new schedule.

On September 12, 2005, the effective date of the new schedule, Chief Daniels announced that he was recruiting volunteers to do a special Door Stop operation for the evening of September 15, 2005, from 4:00 p.m. until midnight. As of September 14, 2005, Chief Daniels claimed that he had not recruited enough volunteers to man the operation and ordered several inspectors, including Plaintiff, to participate in the late evening operation for the following day.

Later that day, Plaintiff approached Chief Daniels and explained that she could not make appropriate child care

arrangements on only one day's notice, especially after she already had made substantial adjustments to accommodate the new day shift schedule. She requested that she be allowed to work her regular shift, go home to get her seven children organized, fed and ready for bed, and return to join the operation at 8:00 p.m. and work until closing. She also stated that she would forego any overtime or compensatory time for the proposed extended workday. Chief Daniels rejected the idea and said that if she did not report at 4:00 p.m. that she could not come in at all. Chief Daniels also rejected Plaintiff's request to use a vacation day and said that he would only accept a personal day or sick leave. Plaintiff had no personal days available and said that she could not use sick time because she wasn't sick. Plaintiff alleges that this is the first time she was ever refused the use of one type of leave in favor of another type of leave. Plaintiff alleges that, having no other choice, she did not come to work the night of the 15th and she was docked a day's pay. Plaintiff also alleges that when the team on the 15th met at 4:00 p.m. that they sat around the office for six hours until 10:00 p.m. until Chief Daniels arrived.

Plaintiff alleges that the culmination of her reassignment to Chief Daniels who she and others knew to be vindictive and retaliatory, along with his Kool Moe Dee comments, the manipulation of her work schedule, and the denial of her leave

request caused her to feel great stress such that her physician recommended that she take 12 weeks off from work. To that end, her physician gave her a disability slip, which Plaintiff submitted to Secretary Irby on September 19, 2005. Secretary Irby approved the medical leave and advised that her expected return date would be December 20, 2005.

Three days later, on September 22, 2005, the Commissioners sent a letter to Secretary Irby requesting information about accumulated sick and FMLA leave for all inspectors under Chief Daniels' supervision. On September 25, 2005, Commissioner Smith followed this request with one specifically asking for details about Plaintiff's leave in addition to asking for copies of all her evaluations and work product since working for the Liquor Board.

**C.   Plaintiff's Suspension and Termination**

While Plaintiff was on medical leave, the Commissioners and Chief Daniels initiated proceedings to terminate her. At an Executive Session meeting on October 20, 2005, the Commissioners unanimously agreed to "move to separate Ms. Brooks from employment of the BLLC" and authorized Commissioner Smith to launch an investigation into whether she had violated any policies of the Liquor Board or brought the agency into disrepute, including through job abandonment.

Shortly thereafter, Commissioner Smith wrote a letter to Secretary Irby and Deputy Secretary Jane Schroeder on October 31, 2005, reprimanding them for failing to respond to his request for Plaintiff's records and stating that "[t]he Brooks matter creates a clear and present problem for this agency." Deputy Schroeder responded to the letter on November 1, 2005, and told Commissioner Smith that Chief Daniels maintained much of the requested documentation. Commissioner Smith forwarded Deputy Schroeder's e-mail to Chief Daniels who complained to Smith that Plaintiff had spent the last two years under the protection of Mr. Irby and that during that reign of administrative protection, she did virtually nothing along with various other allegations including that she spent most of her time web surfing and that an anonymous unit member reported that she was primarily spending her time developing home schooling materials.

On November 20, 2005, Chief Daniels submitted a memorandum entitled "B.L.L.C. Note from Daniels . . . Disciplinary Draft-Brooks" accusing Plaintiff of several infractions and recommending her termination. Specifically, Daniels' memorandum accused the Plaintiff of (1) turning in falsified routine inspection forms on September 12, 2005; (2) violating the agency's protocol for serving summonses on September 13, 2005; (3) being disruptive and insubordinate during her discussion

with Daniels about her leave and the Door Stop operation on September 14, 2005; (4) failing to participate in the Door Stop operation on September 15, 2005; (5) using an "insubordinate" and "pathological" tone when filing her grievance on September 15, 2005; (6) being absent without leave when she went on medical leave on September 19, 2005; and (7) misleading Inspector Gilliam on September 19, 2005, into believing that he had been terminated for being sick.  In the memorandum, Chief Daniels specifically refers to his letters to Secretary Irby dated March 19, 2003, and March 22, 2003, and quotes from those letters as part of his recommendation for her termination.

On November 28, 2005, Commissioner Smith again wrote to Secretary Irby questioning whether Plaintiff legitimately accrued her sick leave.  The letter also specifically mentions that Commissioner Smith reviewed Plaintiff's personnel file and that her sexual harassment claim had no merit.  Commissioner Smith concludes that Secretary Irby is "directed that we are moving for Ms. Brooks (sic) removal from our employ."  Secretary Irby responded that this was the only time Plaintiff had ever used sick leave while at the agency and that the Administrative Manual for Baltimore City provides for employees to accumulate sick leave at a rate of one day per month.

Plaintiff returned to work on December 20, 2005, which was the date that Secretary Irby had told her to return.  Because of

a miscalculation on the part of Secretary Irby, however, it was thirteen weeks instead of twelve.

The same day Plaintiff returned, Chief Daniels sent an e-mail to Smith, copying the other Liquor Board members, stating that she had returned and asking how to proceed with her.  He indicated that further delay was "not an option" and that [i]f action is your answer, then let's get busy."

Initially, the Commission gave Plaintiff a letter of suspension on December 27, 2005, but because the letter did not comply with administrative procedure, it was rescinded and the Liquor Board gave Plaintiff a new suspension letter on January 4, 2006, informing her that she was being suspended without pay. The memorandum prepared by Chief Daniels dated November 20, 2005, was attached to the December 27, 2005, suspension letter as support for the Liquor Board's decision.  On March 24, 2006, Chief Daniels and the Liquor Board sent Plaintiff a Notice of Termination based upon charges that, since August 2005, Plaintiff had "exhibited behaviors constituting a pattern of insubordination, unreliable job performance, prolonged absence and job abandonment."

After Plaintiff's termination, she filed an appeal to the Civil Service Commission, which was adjudicated before an administrative law judge (ALJ) on September 13-14, 2006. Ultimately, the ALJ found that there had been no "just cause"

for Plaintiff's termination and directed that Plaintiff be reinstated with backpay from January 4, 2006. Although the Liquor Board and Chief Daniels moved for reconsideration, following a subsequent hearing on August 16, 2007, the ALJ denied the motion and ordered the Plaintiff reinstated.

On November 20, 2006, Plaintiff filed a complaint against the BLLC with the Equal Employment Opportunity Commission (EEOC), alleging that her termination was in retaliation for her 2003 sexual harassment complaint. On August 31, 2007, the EEOC gave Plaintiff a right to sue letter.

### III. DISCUSSION

Section 704(a) of Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C.A. § 2000e-3(a). As Plaintiff has not provided direct evidence that her suspension and termination was a result of her sexual harassment complaint, Plaintiff's Title VII retaliation claim is evaluated under the burden shifting framework set out in McDonnell Douglas v. Green, 411 U.S. 792, 802-05. See Lettieri v. Equant Inc., 478 F.3d 640, 649 (4th Cir. 2007). Under the McDonnell Douglas framework, Plaintiff must first establish a prima facie case of retaliation under Title VII. Id. at 650. Once the prima facie case has

been established, the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for the adverse employment action. Id. at 648, 651. If Defendants are able to meet their burden, the burden shifts back to Plaintiff to demonstrate that the reason offered by Defendants is false or pretextual and that the real reason for the action was unlawful retaliation. Id.

## A. Plaintiff's Prima Facie Case of Retaliation

To establish a prima facie case of retaliation under Title VII, Plaintiff must demonstrate 1) that she engaged in a protected activity; 2) that Liquor Board took materially adverse action against her; and 3) a causal connection between the protected activity and the adverse employment action. See Id. at 650. Defendants contest only the third element. When there is no direct evidence of a connection between the protected activity and the adverse employment action, Plaintiff may also demonstrate a retaliatory motive through 1) temporal proximity between the complaint and the adverse employment action or 2) "evidence of recurring retaliatory animus during the intervening period." Id. at 650.

Defendants argue that the two-and-a-half years between Plaintiff's June 2003 complaint and her suspension in January 2006 is far too long to establish causation through temporal proximity. Moreover, Defendants argue that Plaintiff has provided no evidence of "recurring retaliatory animus during the

intervening period."  They highlight the fact that from March 2003 to August 2005, a period of over two years, Plaintiff and Chief Daniels had almost no contact with each other.  The evidence suggests, however, the possibility that almost from the time the governor appointed the new Liquor Board that Commissioner Smith and Chief Daniels targeted Plaintiff for termination.  The question, then, is whether this targeting was in retaliation for Plaintiff's sexual harassment complaint.

The evidence viewed in the light most favorable to Plaintiff raises a question whether immediately after Plaintiff's verbal complaint to Secretary Irby, Chief Daniels took actions towards having Plaintiff terminated in retaliation for her complaint.  In particular, Chief Daniels wrote a letter to Secretary Irby just days after Plaintiff's verbal complaint on March 19, 2003, discussing problems with her performance.  Chief Daniels second letter to Secretary Irby dated March 22, 2003, written in response to Plaintiff's letter in defense, states specifically that Chief Daniels was aware of Plaintiff's sexual harassment allegation at the time that he was writing the letter.  Out of four paragraphs, two focused on how her complaint was fabricated and how the despicable practice of sexual harassment has been trivialized by such false complaints.  Chief Daniels concluded his letter by saying that "[g]iven Inspector Brooks' current actions, I envision no future credible

role for her in the Inspection Division." The language Chief Daniels used suggests that her alleged fabricated complaint was the reason for his inability to "envision [any] future credible role for her in the Inspection Division."

Both Secretary Irby and the EEO agreed that the best course of action to prevent further potential problems was to remove Plaintiff from Chief Daniels' supervision. There are no complaints regarding Plaintiff's job performance while serving under Secretary Irby and, in fact, Secretary Irby has stated that her performance was excellent. It was only when Commissioner Smith, the alleged friend of Chief Daniels, was appointed to the Liquor Board and he reassigned Plaintiff to work under Chief Daniels that any allegations of improper behavior on the part of Plaintiff reappear. Notably, the Civil Service Commission found that these allegations were significantly flawed.

The appearance that Chief Daniels and Commissioner Smith targeted Plaintiff for termination does not, by itself, demonstrate a causal connection between Plaintiff's complaint and her termination. The repeated references to her complaint in relation to efforts to suspend and terminate Plaintiff throughout the months following Plaintiff's reassignment to Chief Daniels' supervision, however, suggest at least a question of causation that is best left for a jury to answer. For

example, in Plaintiff's meeting with Commissioner Smith when he advised her that she was reassigned to Chief Daniels' supervision, Plaintiff alleges that he stated that he believed that her complaint lacked merit and that he would not have a problem terminating her and justifying his actions. Commissioner Smith again made reference to his belief as to the lack of merit of Plaintiff's complaint in his November 28, 2005, letter to Secretary Irby challenging whether Plaintiff legitimately accrued her sick leave. Moreover, the Liquor Board justified its suspension and termination based on Chief Daniels November 20, 2005, memorandum that quotes directly from his March 19, 2003, and March 22, 2003, letters to Secretary Irby.

Citing to <u>Hill v. Lockheed Martin Logistics</u>, 354 F.3d 277 (4th Cir. 2004), Defendants argue that, as a matter of law, because Chief Daniels himself was not the actual person that terminated Plaintiff, Plaintiff cannot establish causation. They argue that even if the employee with a retaliatory bias played a significant role in the adverse employment decision, it is not sufficient to hold the employer liable unless the employee "possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker. Pl. Renewed Mot. at 11 (quoting <u>Hill</u>, 354 F.3d at 291). The <u>Hill</u> court concluded, however, that the discrimination inquiry is not limited "to the actions or statements of formal decisionmakers

for the employer.  Such a construction of those discrimination statutes would thwart the very purposes of the acts by allowing employers to insulate themselves from liability simply by hiding behind the blind approvals, albeit non-biased, of formal decisionmakers." Id. at 290.  Rather, "[w]hen a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decisionmaker or the one principally responsible for the contested employment decision," as long as he otherwise qualifies as an employer or agent of the employer under the discrimination statute.  Id. at 290.

Here, the entire basis for the Liquor Board's termination of Plaintiff was Chief Daniels' November 20, 2005, memorandum. The Liquor Board was aware of Plaintiff's sexual harassment complaint against Chief Daniels, yet did almost no independent investigation into Chief Daniels' accusations against Plaintiff. Their failure to appear to act independently is notable as there were no disciplinary complaints against Plaintiff other than by Chief Daniels despite her having served under Secretary Irby for over two years.  Moreover, Chief Daniels' complaints arose only after her sexual harassment complaint and then immediately after she was reinstated to his supervision.  The only purported independent investigation conducted by the Liquor Board related

to Plaintiff's sick leave.  Defendants allege that the
Commissioners believed that Plaintiff taking sick leave was part
of a protest of the Liquor Board's changes in which Defendant
was one of five inspectors taking sick leave, and was,
therefore, an abuse of the sick leave policy.  Even if this
belief were true, Plaintiff appears to be the only one of the
inspectors to have been terminated on that basis making this
rationale for her termination suspect.

The Liquor Board's reliance on Chief Daniels' memorandum as
its sole support for Plaintiff's termination along with their
knowledge regarding Plaintiff's complaint, and the allegations
as to the friendship between Chief Daniels and Commissioner
Smith and Commissioner Smith's dominance on the Liquor Board
provides sufficient evidence to raise a material issue of fact
as to whether Chief Daniels was principally responsible for the
decision to suspend and terminate Plaintiff.  Thus, Plaintiff
has sufficiently established a prima facie case of retaliation
to survive a summary judgment motion.

## B.    Defendants' Legitimate, Nonretaliatory Reasons for Plaintiff's Termination

As Plaintiff has established a prima facie case of
retaliation, the burden shifts to Defendants to articulate a
legitimate, nonretaliatory reason for the adverse employment
action.  The Defendants' legitimate reasons are outlined in

Chief Daniels' November 20, 2005, memorandum.  Defendants in their motion focus specifically on Plaintiff's failure to participate in the Door Stop operation on September 15, 2005, and Chairman Fosler and Commissioner Smith's alleged beliefs that Plaintiff had abused sick leave by taking three months of paid leave for a "stress-related condition."  Thus, Defendants have articulated legitmate, non-retaliatory reasons for her suspension and termination sufficient to transfer the burden to Plaintiff to demonstrate that Defendants' reasons were pretextual.

## C.    Plaintiff Has Demonstrated a Question Whether Defendants' Reasons Were Pretextual

The Civil Service Commission examined each of Defendants' grounds for terminating Plaintiff and found them to be deficient based on evidence almost identical to the evidence produced in connection with this summary judgment motion.  This Court agrees with the Commission's determination and will not rehash their entire analysis.  The Court will address Plaintiff's failure to participate in the Door Stop operation and medical leave, however, as those were the issues specifically raised by Defendants in their motion.

The evidence presented, viewed in the light most favorable to Plaintiff, does not support the conclusion that Plaintiff was insubordinate in failing to participate in the September 15,

2006, Door Stop operation.  Plaintiff was given only one day's notice that she would be required to conduct the nighttime operation, even though only two days earlier she had had to adjust her schedule and childcare arrangements to work a new daytime schedule.  Plaintiff advised Chief Daniels that she could not obtain childcare on such short notice and offered multiple compromises to avoid simply not appearing for the operation, including working a full day and returning later in the evening to join the operation, or taking a vacation day.  Chief Daniels refused, however, and said that she would have to either take personal leave, which she did not have, or sick leave, even though she was not sick.  Particularly disconcerting is that after refusing Plaintiff's request to join the operation at 8 p.m., Plaintiff alleges that the operation did not ultimately begin until 10 p.m. and Defendants have not refuted this allegation.

As for Plaintiff's sick leave, regardless of whether the documentation was ideal, no one denies that it was approved by Secretary Irby or that Plaintiff had not accumulated sufficient sick days to meet the 3 months.  Moreover, although she returned to work one week after the time allotted by her doctor, Secretary Irby has stated that he made a mistake in computing the time, not Plaintiff, and he is the one that told her when she should return.  Moreover, Plaintiff regularly met with

Secretary Irby to update him while she was out.  Finally, although Defendants seem to allege that Plaintiff taking medical leave was some sort of organized protest of the Liquor Board's changes, the evidence indicates that Plaintiff was the only one fired for taking medical leave.  If the Liquor Board truly believed that there was an organized protest abusing sick leave, then there is a big question, which Defendants have not answered, as to why only Plaintiff was terminated.

The evidence indicates a concerted effort to build a case to terminate Plaintiff rather than any legitimate concerns regarding job performance, particularly in light of Plaintiff's clean record under Secretary Irby's supervision.  The appearance of targeting Plaintiff for termination combined with the repeated references to Plaintiff's 2003 sexual harassment complaint, the connection between Chief Daniels and Commissioner Smith, and the Liquor Board's wholesale adoption of Chief Daniels' reasons for termination creates a strong inference that Defendants' stated reasons for terminating Plaintiff were solely pretextual and may have been retaliatory.  As the evidence creates a significant question of fact on the issue of pretext, it must be left for the jury.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Renewed Motion for Summary Judgment will be denied.  A separate order will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge

April 20, 2010